IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Lola Robinson, *individually and as Personal Representative of the Estate of Jimmy Lee Ham*, | ) ) ) | |
| | ) | C/A No. 0:19-826-PJG |
| Plaintiff, | ) ) | |
| v. | ) ) | **OPINION AND ORDER** |
| | ) | **GRANTING** |
| Warden Timothy Riley; Associate Warden Andrea Thompson; Associate Warden Gary Lane; Major V. Jackson; Captain Yolanda Brown; Lt. Tecorrie Garvin; Lt. Travis Pressley; Sgt. Dewaun McKan; Cpl. Matthew Whitaker; C/O Damian Jones, | ) ) ) ) ) ) ) ) | **SUMMARY JUDGMENT** |
| Defendants. | ) ) | |
| | ) | |
| James H. Kelley, *individually and as Personal Representative of the Estate of Jason H. Kelley*, | ) ) ) | |
| | ) | C/A No. 0:19-827-PJG |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| Warden Timothy Riley; Associate Warden Andrea Thompson; Associate Warden Gary Lane; Major V. Jackson; Captain Yolanda Brown; Lt. Tecorrie Garvin; Lt. Travis Pressley; Sgt. Dewaun McKan; Cpl. Matthew Whitaker; C/O Damian Jones, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

David T. King, *individually and as Personal*                   )
*Representative of the Estate of John Telly*                     )
*King*,                                                          )
                                                                )       C/A No. 0:19-828-PJG
                        Plaintiff,                              )
                                                                )
v.                                                              )
                                                                )
Warden Timothy Riley; Associate Warden                          )
Andrea Thompson; Associate Warden Gary                          )
Lane; Major V. Jackson; Captain Yolanda                         )
Brown; Lt. Tecorrie Garvin; Lt. Travis                          )
Pressley; Sgt. Dewaun McKan; Cpl. Matthew                       )
Whitaker; C/O Damian Jones,                                     )
                                                                )
                        Defendants.                             )
_____                           )
                                                                )
Susan Diane Scruggs, *as Personal*                              )
*Representative of the Estate of William*                       )
*Bradley Scruggs*,                                              )       C/A No. 0:20-1014-PJG
                                                                )
                        Plaintiff,                              )
                                                                )
        v.                                                      )
                                                                )
Warden Timothy Riley; Associate Warden                          )
Gary Lane; Major V. Jackson; Captain                            )
Yolanda Brown; Lt. Tecorrie Garvin; Lt.                         )
Travis Pressley; Sgt. Dewaun McKan; Cpl.                        )
Matthew Whittaker; C/O Damian Jones, *all in*                   )
*their individual capacities*,                                  )
                                                                )
                        Defendants.                             )
_____                           )

        The above-captioned civil rights cases pursuant to 42 U.S.C. § 1983 are before the court

on the defendants' motions for summary judgment.  The cases all arise out of the serial murders

of Jimmy Lee Ham, Jason H. Kelley, John Telly King, and William Bradley Scruggs (collectively,

"Plaintiffs' decedents") by two of their fellow inmates, Jacob Philip and Denver Simmons, within

the South Carolina Department of Corrections ("SCDC") on April 7, 2017.[1]  This matter is before

the court pursuant to 28 U.S.C. § 636(c) and Local Civil Rule 73.02(B)(1) (D.S.C.) with the

consent of the parties for final adjudication.  The summary judgment motions have been fully

briefed and extensively argued.[2]  For the reasons that follow, the defendants' motions are hereby

granted.

## BACKGROUND

At the outset, it is undisputed that these cases arise from the horrific murders of four

inmates by two other inmates on April 7, 2017, during which time all were housed in the

Intermediate Care Services ("ICS") unit at Kirkland Correctional Institution ("Kirkland").

However, the individuals who planned and carried out these murders are not defendants in this

matter, and the limited questions before the court are whether the guards on duty during that time,

their supervisors, and other individuals in the chain of command at Kirkland were *deliberately

indifferent* to the safety and medical needs of the deceased inmates, either through their direct

actions or in their supervisory roles.  As noted above, the related state law tort claims involving a

lesser standard are not pending before this court.

---

[1] There is a separate, related 42 U.S.C. § 1983 case filed on behalf of Scruggs's estate regarding purported failures in the mental health treatment of Scruggs, Philip, and Simmons, as well as parallel actions in state court raising state tort claims.

[2] The following motions and memoranda were filed in connection with the pending motions for summary judgment:  (ECF Nos. 106, 107, & 108 (Robinson); ECF Nos. 109, 110, & 111 (Kelley); ECF Nos. 108, 109, & 110 (King); ECF Nos. 74, 75, & 76 (Scruggs)).  Plaintiffs filed responses in opposition to the motions (ECF Nos. 112, 111, 110 (Robinson); ECF Nos. 115, 114, & 113 (Kelley); ECF Nos. 114, 113, & 112 (King); ECF Nos. 78, 80, & 79 (Scruggs)), and the defendants replied (ECF Nos. 115, 117, & 116 (Robinson); ECF Nos. 118, 121, & 119 (Kelley); ECF Nos. 117, 120, & 118 (King); ECF Nos. 83, 88, & 86 (Scruggs)).  Additionally, the court heard extensive oral argument on the motions on December 2, 2021.

Against that backdrop, the following facts are either undisputed or are taken in the light most favorable to Plaintiffs, to the extent they find support in the record.[3]  Inmates Jacob Philip and Denver Simmons were designated by SCDC officials as head "ward keepers" in the ICS unit. Head ward keepers were tasked with keeping stock of cleaning supplies and distributing those supplies to other inmates.  Because of these duties, Philip and Simmons had the privilege of having their cell doors unlocked between the hours of 6:00 a.m. and 6:00 p.m., during which time they were free to move about the unit.  The other inmates were permitted to go to Philip's or Simmons's cells to obtain cleaning supplies.

On the morning April 7, 2017, Philip and Simmons lured, one after another, Inmates King, Scruggs, Ham, and Kelley into Cell 261—Simmons's cell—and killed them in that order between the hours of 7:49 a.m. and 10:13 a.m.  Philip and Simmons murdered Plaintiffs' decedents using extension cords, broom handles, and their arms.  No other inmates or SCDC officers noticed the murders as they occurred, so around 10:13 a.m., Philip and Simmons walked out of the dorms into the prison's administration building where Simmons told officers to check his cell.  Defendants McKan and Jones, the correctional officers who responded, found the four dead inmates in Simmons's cell.  At Jones's direction, McKan summoned emergency medical personnel, who arrived three to five minutes later.

The killers admitted that they planned the murders and expressed no remorse.  Philip stated to investigators that he hated people and that he and Simmons would have killed a fifth person, but they did not have time.  Simmons later claimed to a journalist that he killed the inmates because he wanted to receive the death penalty.

---

[3] Because the records in these cases are substantially similar, all record citations are to Electronic Case Filing entries in C/A No. 0:19-826 unless otherwise specified.

The ICS unit at Kirkland "provides residential services for inmates with serious persistent mental illness who require intensive treatment, monitoring, and care, but do not need psychiatric hospitalization." (SCDC Policy HS-19.12, ECF No. 106-2.) All inmates in the ICS unit suffer from mental health issues. Pertinent here, Inmate Philip, one of the killers, was in SCDC serving a life sentence for murdering his girlfriend and her eight-year-old daughter. Philip had also attempted to kill his cellmate while he was in jail in 2014 before being incarcerated in SCDC. Philip was housed in SCDC's psychiatric hospital, Gilliam, before eventually being accepted into the ICS unit at Kirkland.

Inmate Simmons, the other killer, also was serving a life sentence for double murder. Simmons was housed in the ICS unit based on a diagnosis of personality disorder. Simmons also had prison disciplinary convictions for threatening a correctional officer, for striking another inmate with a squeegee, and for other violations of prison rules. Simmons has a history of injuring himself through cutting and attempted suicide.

Inmate King, the first victim, was serving a thirty-year sentence in SCDC for various crimes, including larceny and first-degree burglary. King was admitted to the ICS unit based on schizophrenia and psychosis disorder.

Inmate Scruggs, the second victim, entered SCDC in 2010 to serve a life sentence after being convicted of murder, first-degree burglary, and kidnapping. Scruggs was diagnosed with schizophrenia, paranoid type; polysubstance abuse; and antisocial personality disorder.

Inmate Ham, Philip's and Simmons's third victim of the April 2017 murders, entered SCDC in 2008 to serve a twenty-one-year sentence for assault and battery of a high and aggravated nature, grand larceny, and second-degree burglary. Ham was admitted to the ICS unit for treatment for schizoaffective disorder.

Inmate Kelley, the fourth victim of the April 2017 murders, was serving a fifteen-year sentence for assault and battery of a high and aggravated nature. Kelley's diagnosis was possible unspecified depressive disorder.

## DISCUSSION

### A.    Summary Judgment

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Rule 56 mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.

The moving party has the burden of proving that summary judgment is appropriate. Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth

specific facts showing that there is a genuine issue for trial.[4]  See Fed. R. Civ. P. 56(c), (e); Celotex

Corp., 477 U.S. at 322.

**B.     Eighth Amendment—Failure to Protect[5]**

A legal action under 42 U.S.C. § 1983 allows "a party who has been deprived of a federal

right under the color of state law to seek relief."  City of Monterey v. Del Monte Dunes at

Monterey, Ltd., 526 U.S. 687, 707 (1999).  To state a claim under § 1983, a plaintiff must allege:

(1) that a right secured by the Constitution or laws of the United States was violated, and (2) that

the alleged violation was committed by a person acting under the color of state law.  West v.

Atkins, 487 U.S. 42, 48 (1988).

The Eighth Amendment to the United States Constitution expressly prohibits the infliction

of "cruel and unusual punishments," U.S. Const. amend. VIII, and imposes a duty on prison

officials to provide humane conditions of confinement, including the protection of inmates from

violence at the hand of their fellow inmates.  Farmer v. Brennan, 511 U.S. 825, 833 (1994); see

---

[4] To the extent Plaintiffs' arguments at the hearing suggested that the absence of evidence was sufficient to create a dispute of fact, "[t]he nonmoving party . . . cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."  Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (citing Barwick v. Celotex Corp., 736 F.2d 946, 963 (4th Cir. 1984)); see also Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (stating the non-moving party has "the ultimate burden of demonstrating a genuine issue of material fact for trial" and that "[c]onclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of his case") (internal citations & quotation marks omitted).

[5] Plaintiffs' Complaints also reference the Fourth and Fourteenth Amendments; however, a claim of deliberate indifference to a risk of harm to a convicted prisoner is properly brought pursuant to the Eighth Amendment's Cruel and Unusual Punishment Clause.  See Bell v. Wolfish, 441 U.S. 520, 535 & n.16 (1979); Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988); see also Cooleen v. Lamanna, 248 F. App'x 357, 362 (3d Cir. 2007) ("The very viability of his Eighth Amendment claims means that his substantive due process claims are without merit, as the Supreme Court has explained that 'if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.' ") (quoting Cty. of Sacramento v. Lewis, 523 U.S. 833, 843 (1998)).

also Makdessi v. Fields, 789 F.3d 126, 132 (4th Cir. 2015) ("Prison officials are, therefore, obligated to take reasonable measures to guarantee inmate safety."). Thus, "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Farmer, 511 U.S. at 828.

To proceed with a deliberate indifference claim, a plaintiff must demonstrate: (1) objectively, the deprivation suffered or injury inflicted was "sufficiently serious," and (2) subjectively, the prison officials acted with a "sufficiently culpable state of mind." Id. at 834; Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996); see also Anderson v. Kingsley, 877 F.3d 539, 445 (4th Cir. 2017) ("Farmer defines deliberate indifference as the *intentional* taking of a risk that the defendant knows *might cause harm* while *lacking any intent to cause such harm*."). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.' " Iko v. Shreve, 535 F.3d 225, 238 (4th Cir. 2008) (citing Wilson v. Seiter, 501 U.S. 294, 298-300 (1991)). "What must be established with regard to each component 'varies according to the nature of the alleged constitutional violation.' " Williams, 77 F.3d at 761 (quoting Hudson v. McMillian, 503 U.S. 1, 5 (1992)).

In the context of a claim based on a failure to prevent harm, the objective prong requires a plaintiff to show that he was "incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 834; see also Makdessi, 789 F.3d at 133.

The subjective prong, on the other hand, requires the plaintiff to show that prison officials acted with deliberate indifference to inmate health or safety. Farmer, 511 U.S. at 834; see also Makdessi, 789 F.3d at 133. In other words, the official must "consciously disregard" a known risk of serious harm. Anderson, 877 F.3d at 544 (quoting Farmer, 511 U.S. at 839). "[D]eliberate

indifference entails more than ordinary lack of due care for the prisoner's interests or safety, and more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." Makdessi, 789 F.3d at 133 (quoting Farmer, 511 U.S. at 835) (internal quotation marks and alterations omitted); see also Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) ("[D]eliberate indifference in this context lies somewhere between negligence and purpose or knowledge:  namely, recklessness of the subjective type used in criminal law.") (citing Farmer, 511 U.S. at 836).  Thus, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

Stated differently, "[f]irst, the evidence must show that the official in question subjectively recognized a substantial risk of harm.  It is not enough that the officers *should have* recognized it; they actually must have perceived the risk." Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) (citing Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997)).  "Second, the evidence must show that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'  As with the subjective awareness element, it is not enough that the official *should have* recognized that his actions were inappropriate; the official actually *must have* recognized that his actions were insufficient." Parrish, 372 F.3d at 303 (citations omitted).

"[D]irect evidence of actual knowledge is not required." Makdessi, 789 F.3d at 133. Actual knowledge can also be shown with circumstantial evidence, including evidence that the risk was so obvious that the defendant must have known about it. Id.  However, "it is not enough that a reasonable officer *would have* found the risk to be obvious.  Rather, the risk of injury must be 'so obvious the fact-finder could conclude that the [officer] *did* know of it because he could not have failed to know of it." Parrish, 372 F.3d at 303 (second alteration in original).  Moreover, the

Farmer Court explained that "evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it . . . could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." Farmer, 511 U.S. at 842-43. In these cases, "prison officials may not simply bury their heads in the sand and thereby skirt liability." Makdessi, 789 F.3d at 133.

### 1.     Application of the Farmer Test

Here, the parties all agree that the decedents were murdered by inmates Simmons and Philip on April 7, 2017. The defendants do not appear to dispute the objective component of the Farmer test.

By contrast, the subjective component is hotly debated here. Significantly, the proper analysis turns on what facts must be known and how the nature of the risk is characterized. Courts have recognized that knowledge of an inmate's past violence does not, on its own, rise to the level of deliberate indifference. See Taylor v. Little, 58 F. App'x 66, 68 (6th Cir. 2003) (finding evidence that an inmate recently attacked someone who was scheduled to testify against him, had been hostile to the staff of another correctional facility, had complained about his nerves and emotional state, and had been incarcerated for violent felonies, merely suggested, at most, that "[the inmate], not unlike many inmates in our prison system, is prone to antisocial and sometimes violent behavior" and did not "suggest that prison officials should have been aware that he might randomly attack a fellow inmate"); see also Street v. Corr. Corp. of Am., 102 F.3d 810 (6th Cir. 1996) (finding that incarcerating a prisoner in the same unit of the prison as the victim was not deliberate indifference where both inmates had a history of violence).

Generally, the failure to follow prison policies or procedures is also not enough. See Rich, 129 F.3d at 339-40 (concluding that a guard's knowledge that he was violating prison regulations was not enough to satisfy the subjective prong where the guard failed to realize that his violations of the regulations created a *unique risk* for the plaintiff); Belcher v. Oliver, 898 F.2d 32, 36 (4th Cir. 1990) (providing that "a failure to carry out established procedures, without more, does not constitute" deliberate indifference to the medical needs of an inmate); Peralta v. Dillard, 744 F.3d 1076, 1087 (9th Cir. 2014) (providing that to show deliberate indifference for failure to follow procedures, the plaintiff "must prove both (1) that the failure to follow procedure put inmates at risk and (2) that [the defendant] *actually knew* that his actions put inmates at risk"); Taylor v. Adams, 221 F.3d 1254, 1259 (11th Cir. 2000) ("[F]ailure to follow procedures does not, by itself, rise to the level of deliberate indifference because doing so is at most a form of negligence."). And case law is well settled that negligence is insufficient to constitute an Eighth Amendment claim. Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it."); see generally Davidson v. Cannon, 474 U.S. 344, 347-48 (1986) (holding, pre-Farmer, that the negligent failure to protect a prisoner from another inmate cannot support a § 1983 claim under the Due Process Clause).

Thus, to meet the high standard of deliberate indifference with respect to a failure to follow policies, the actor must have had actual knowledge that his violation of prison rules would expose an inmate to a *substantial* risk—that is, a risk that is both unique and very likely. See Rich, 129 F.3d at 340 (finding "actual knowledge of facts from which a reasonable person might have inferred the existence of the substantial and unique risk to [Plaintiff] caused by [Defendant's] conduct" is not enough to establish a violation of the Eighth Amendment as Defendant "must actually have drawn the inference"); see also Baze v. Rees, 553 U.S. 35, 49-50 (2008) (holding

that to establish exposure to a risk of future harm under the Eighth Amendment, the conditions presenting the risk must be "sure or very likely to cause . . . needless suffering," and give rise to "sufficiently imminent dangers") (quoting Helling v. McKinney, 509 U.S. 25, 34-35 (1993)); Marbury v. Warden, 936 F.3d 1227, 1238 (11th Cir. 2019) (emphasizing that "subjective awareness of only *some* risk of harm to a prisoner is insufficient for a deliberate-indifference claim").   However, knowledge of a specific threat by an inmate to a particular victim is not necessary to state an Eighth Amendment violation.   It is not necessarily relevant to liability that officials "could not guess beforehand precisely who would attack whom."   Farmer, 511 U.S. at 844; see also Jeter v. Musier, No. 2:19-CV-3343-SAL, 2021 WL 2072589, at *5 (D.S.C. May 24, 2021) ("In other words, the prison officials did not necessarily need to be aware that Plaintiff was in danger of being attacked by the assailant hiding in the dayroom. They only needed to be aware of a substantial risk to the inmate.") (citing Farmer, 511 U.S. at 843).   Further, "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk."   Farmer, 511 U.S. at 843.   Thus, while the requisite knowledge and risk need not be so specific as to provide warning of danger from a particular inmate to a particular victim, it must be more concrete than a random attack.

## 2.   Court's Discussion of Plaintiffs' Theory of the Case

Plaintiffs argue that the nature of the ICS unit itself presents an obvious risk of inmate-on-inmate violence.   The parties characterize the unit diametrically:   while the defendants contend the unit was a comparatively peaceful prison unit where inmates generally got along and were relatively content, Plaintiffs insist that it was a high-risk unit because it housed mentally ill inmates, some of whom had violent histories.   (Compare Riley Dep. 180:25, ECF No. 112-10 at

181 ("ICS [] didn't have a whole lot of issues.") and Lane Dep. 63:17-64:8, ECF No. 112-14 at

64-65 ("[I]t was almost like a home feeling in that dorm.") with Aiken Aff. ¶ B, ECF No. 111-1 at

3 ("[T]he inmate population . . . assigned to [the ICS unit]" was a "potentially more dangerous

operational situation [that] required a particularly intense security mitigation application.")).

Plaintiffs further emphasize a hostage situation that occurred in the ICS unit two months before

Warden Riley took over at Kirkland in 2015.  However, no one disputes that the ICS unit housed

inmates with an array of mental health problems, as well as a range of security classifications.

Although all suffered some mental illness that warranted constant care, not all were violent people,

and not all of them presented a risk of violence to other inmates as opposed to self-harm.  (See,

e.g., Garvin Dep. 89:3-15, ECF No. 112-19 at 90; Jackson Dep. 191:17-20, ECF No. 112-16 at

192; McKan Dep. 81:12-21, ECF No. 112-4 at 82.)  Plaintiffs argued during the motions hearing

that, in this setting, violation of prison safety policies presents an obvious substantial risk of serious

harm.  Similarly, they contend, permitting ICS inmates to have privileges such as being ward

keepers presents an obvious unconstitutional risk.

The Eighth Amendment, however, requires a more precise formulation of the requisite

knowledge and substantiality of the risk to establish the subjective component based on the

constitutional violation alleged here.  "[A]s the vagueness of a threat increases, the likelihood of

actual knowledge of impending harm decreases.  So, too, does the official's ability to respond."

Reed v. Robinson, No. 3:20CV200, 2021 WL 3192166, at *5 (E.D. Va. July 28, 2021) (quoting

Dale v. Poston, 548 F.3d 563, 569 (7th Cir. 2008)).  Another district court within the Fourth Circuit

provided this helpful summary:

> A risk of assault may be sufficiently substantial as to require action by prison
> officials where it is "highly probable" that a particular attack will occur, or in
> instances where a particular inmate "pose[s] a heightened risk of assault to the
> plaintiff."  Brown[ v. Budz], 398 F.3d [904,] 911 [(7th Cir. 2005)]; see, e.g., Purvis

> v. Johnson, 78 F. App'x 377, 379 (5th Cir. 2003) (concluding that plaintiff's allegations that he informed officials four times that his cell-mate was a racist and threatened him every day because he was white, sufficiently stated a claim for failure to protect).  Negligence or inadvertence does not suffice; rather, "[i]n order to infer callous indifference when an official fails to protect a prisoner from the risk of attack, there must be a strong likelihood rather than a mere possibility that violence will occur."  Pinkston v. Madry, 440 F.3d 879, 889 (7th Cir. 2006) (alteration in original) (internal quotation marks omitted) (citation omitted).

Welty v. Meletis, No. 3:16CV659, 2019 WL 2656200, at *5 (E.D. Va. June 27, 2019).

Other persuasive case law also undermines Plaintiffs' blanket argument that an unconstitutional risk was obvious to the defendants on these facts, as courts addressing alleged obviousness or other circumstantial evidence of actual knowledge have required more specific evidence.  For example, in Marbury v. Warden, 936 F.3d 1227 (11th Cir. 2019), the United States Court of Appeals for the Eleventh Circuit concluded that the evidence forecast on summary judgment was insufficient for a reasonable jury to find that the defendant was subjectively aware of a substantial risk of serious harm to the inmate at the time.  This was so even though the record permitted the conclusion that the defendant "was aware of the potential for inmate-on-inmate violence at the prison, [the inmate] told her that another inmate was looking to harm him, and she responded by laughing at [the inmate] and telling him to get a knife because he had a 'problem.' " Id. at 1238.  The court emphasized that "subjective awareness of only *some* risk of harm to a prisoner is insufficient for a deliberate-indifference claim."  Id.

Similarly, in Carter v. Galloway, 352 F.3d 1346, 1349, 1350 (11th Cir. 2003), the Eleventh Circuit found that the evidence was insufficient to establish the subjective awareness requirement. There, circumstances showed that the defendants had knowledge that an inmate was a "problem inmate" with a well-documented history of prison disobedience, the inmate had been prone to violence, and the defendants had specific notice from the plaintiff that the inmate "acted crazy, roaming his cell like a 'caged animal.' "  Id. at 1349.  Further, the court rejected the contention

that the defendants drew the inference of a serious threat to the plaintiff from a fellow inmate's reported comment that he wanted to fake a hanging and the plaintiff would help in the fake hanging "one way or another." Id. at 1350 ("Defendants would have had to read imaginatively all derogatory and argumentative statements made between prisoners to determine whether substantial risks of serious harm exist.").[6]

Here, several different key pieces of information must be gleaned to infer a *substantial* risk of future serious harm to an inmate from another inmate within the ICS unit. On these facts, to hold any of the individual defendants liable for directly committing a constitutional violation, Plaintiffs must show that the individual defendant had actual knowledge of an imminent risk of serious harm from inmate-on-inmate violence, coupled with actual knowledge that the defendant's action or inaction increased that risk to a strong likelihood that an inmate would commit violence against other inmates. See Parrish, 372 F.3d at 304 (citing Rich, 129 F.3d at 339). To do so, first Plaintiffs must show that the particular defendant knew or must have known of Philip's or Simmons's propensity for violence. Second, they must show that the risk Philip or Simmons presented to others was an *imminent* threat of harm. See Welty, 2019 WL 2656200 at *5 (requiring a strong likelihood, rather than a mere possibility, that violence will occur); cf. Carter, 352 F.3d at 1350 (knowledge of a problem inmate prone to violence who was "acting crazy" was not enough); Street v. Corr. Corp. of Am., 102 F.3d 810 (6th Cir. 1996) (placing two violent inmates in the same unit was not enough); Taylor, 58 F. App'x at 68 (random attack of an inmate by another inmate with a history of violence and instability was not enough). Third, the defendant would have to know either (1) that an inmate presenting an imminent threat had privileges that substantially

_____

[6] These Eleventh Circuit decisions square with Fourth Circuit precedent. See Rich, 129 F.3d at 339-40, discussed below.

increased his likelihood to harm others, or (2) that violation of a particular prison custom by the defendant would increase the risk that an imminently dangerous perpetrator would harm others. See Parrish, 372 F.3d at 303 (holding that a defendant must have subjectively recognized that his action or inaction was inappropriate in light of the risk).

Without these essential pieces of information, the risk of serious harm cannot be said to have been so substantial as to rise to a constitutional injury. The case of Rich v. Bruce, 129 F.3d 336 (4th Cir. 1997), compels this conclusion. In Rich, the United States Court of Appeals for the Fourth Circuit addressed facts similar to those alleged in the case at bar where a guard's violation of prison policy allegedly resulted in harm to an inmate from another inmate. The Rich Court held that the plaintiff had failed to present sufficient evidence to establish a claim for failure to protect. There, the prison guard had knowledge that inmate Rich was at particular risk from the perpetrator. The guard also knew that his actions on the day of the incident violated the regulations for the SuperMax unit. Notably, the Rich Court found that the evidence presented at trial did not establish that the guard had actual knowledge that his actions *uniquely increased the general risks* to which the plaintiff was exposed "each and every day he was incarcerated in disciplinary segregation at SuperMax." Id. at 339. The Rich Court rejected the plaintiff's argument that the general risks of inmate violence in the SuperMax unit along with the guard's deliberate violation of rules specifically designed for the SuperMax segregation unit were sufficient to show actual knowledge for an Eighth Amendment claim based on deliberate indifference. Id. at 339-40. That was so even where "there had been other instances of inmates stabbing or shanking other inmates while the victims were handcuffed," *and* the regulations the guard violated were designed *precisely* for that situation. Id. at 339 (internal quotation marks omitted).

Recently a court in this district found that there was not sufficient evidence in the record to permit a reasonable trier of fact to conclude that the defendant was aware of a substantial risk of serious harm before an inmate was assaulted. See Battle v. S.C. Dep't of Corr., No. 9:19-CV-1739-TMC, 2021 WL 4167509 (D.S.C. Sept. 14, 2021). In Battle, the evidence viewed in the light most favorable to the plaintiff showed a more specific threat than that presented here. Id. There, the court recounted the following facts: (1) the plaintiff told the defendant right before the assault that "something ain't right, I feel uncomfortable, like I feel . . . that something about to happen"; (2) when the defendant questioned what the plaintiff thought was going to happen, he said "I feel like something about to happen"; and (3) the plaintiff testified that the defendant "was like just go back on the wing. . . . [S]he thought I was playing, because that's what . . . most people [do] with the COs . . . ." Id. at *9-10. The court stated that although these facts may establish that the defendant "had an inkling that trouble was afoot in that area of the prison," they were insufficient to establish the subjective awareness requirement. Id. at *10. Moreover, the risk was not obvious, as there was no evidence suggesting that the defendant "was exposed to information suggesting a 'longstanding, pervasive, well-documented' risk to inmates such that she 'must have known' about the risk to [the p]laintiff." Id. at *11.

On the other hand, when judges in this district have found sufficient evidence for a reasonable jury to find that the prison administrators possessed subjective awareness of an obvious risk, they confronted stronger circumstantial evidence than what is presented in the instant case. In those cases, although there was no direct evidence of actual knowledge, the warden and associate warden—based on their positions, expert reports, and testimony—were aware of the numerous inmate-on-inmate assaults at their institution from various reports they received and the statistical data they were required to report. Those widespread assaults indicated a substantial risk

of serious harm that was longstanding, pervasive, and well-documented prior to the assault on the plaintiff.  See Lee v. S.C. Dep't of Corr., No. 0:19-CV-02237-JD, 2021 WL 1220857, at *4-5 (D.S.C. Apr. 1, 2021); see, e.g., Stephens v. S.C. Dep't of Corr., No. CV 4:17-3482-JFA, 2021 WL 1040521, at *6-7 (D.S.C. Mar. 18, 2021) (finding a dispute of fact as to whether the subjective awareness requirement was satisfied for the wardens based on circumstantial evidence concerning the number of inmate-on-inmate assaults and the understaffing issues at the institution that would create an inference of a substantial risk of serious harm that was longstanding, pervasive, and well-documented and whether those issues contributed to the plaintiff's attack); Crawford v. S.C. Dep't of Corr., No. 6:18-CV-2407-DCN, 2020 WL 5835073, at *11 (D.S.C. Oct. 1, 2020) (same); see also Woodhous v. Commw. of Va., 487 F.2d 889, 890 (4th Cir. 1973) (per curiam) ("[C]onfinement in a prison where violence and terror reign is actionable.").

Here, viewed in the light most favorable to Plaintiffs, the evidence, contrary to showing an obvious risk, does not permit a reasonable jury finding of a substantial risk of serious harm to an inmate from another inmate within the ICS unit.  As noted above, successful Eighth Amendment plaintiffs may show that an individual defendant was exposed to information showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, and thus must have known of the risk.  Farmer, 511 U.S. at 842-43.  Here, Plaintiffs appear to argue that the substantial risk to serious harm was obvious because (1) ICS is a mental ward with various level of offenders, (2) there was a hostage situation in ICS in 2015, (3) Simmons had disciplinary infractions involving hitting another inmate with a squeegee and verbally threatening another officer, and (4) certain freedoms were given to Simmons and Philip as head ward keepers.  Unlike the above cases finding an obvious risk based on known reports of numerous inmate-on-inmate attacks combined with either staff shortages or significant contraband reports or both, these

isolated incidents and the status of ICS as a mental ward unit housing various level of inmates do not rise to the level of an obvious risk. Stated differently, there is insufficient evidence from which a reasonable jury could find that any of the defendants possessed subjective awareness of an obvious risk.

### 3.    Actual Knowledge Specific to Each Defendant

**McKan**. The court begins with whether the record reasonably supports a conclusion that McKan, the guard on duty in the B Wing of ICS where the murders took place, had actual knowledge that his alleged violation of procedures created a substantial risk of serious harm to other inmates. Plaintiffs focus on several alleged safety violations by McKan: (1) failing to look into every cell window during his rounds;[7] (2) leaving ICS inmates' cell doors unlocked even when they did not have head ward keeper privileges; (3) failing to notice the cell window in Cell 261 was covered on the day of the murders; and (4) generally failing to monitor Philip and Simmons as head ward keepers.

While Plaintiffs strenuously contend that McKan's myriad deficiencies as a correctional officer occurred in the face of knowledge of a substantial risk to inmates' physical safety, the record does not support such a conclusion. Plaintiffs suggest that Defendants Jones and McKan testified to having weekly meetings with their head ward keepers in the ICS and therefore, must have known there was a substantial risk of danger to the other inmates from Simmons and Philip; however, the deposition testimony does not support that assertion. When asked if he had weekly or biweekly meetings with the head ward keepers, McKan stated, "I mean, I would ask them was everything good, you know, things like that. And that's -- but yeah." (McKan Dep. 125:15-21,

---

[7] Although many witnesses testified that the best practice is for a guard to look through every cell window when conducting rounds in the unit, there is no apparent dispute that no written policy required the guards to do so.

ECF No. 112-4 at 126.)  Similarly, Jones testified that he would meet with the ward keepers on his side of the unit (not Simmons and Philip) to "see about whatever problems they were seeing" and "see what needs to be done."  (D. Jones Dep. 33:22-34:6, ECF No. 112-3 at 34-35.)  Moreover, McKan's testimony does not support Plaintiffs' position that McKan *routinely* conducted his security checks incorrectly by failing to look in the cells ever since he became an officer in 2014. (McKan Dep. 91:15-93:20, ECF No. 112-4 at 92-94) (testifying that he "sometimes" didn't look into rooms during security checks when there were "a lot of things going on," such as when he knew inmates were away from their cells).  Additionally, contrary to Plaintiffs' characterization, McKan did not testify that he would have disciplined Jones if he had observed Jones performing a security check without looking all the way into a cell.  (McKan Dep. 100:17-101:10, ECF No. 112-4 at 101-102) (testifying that if he hypothetically saw Jones perform a security check improperly he "would tell [Jones to] . . . go ahead and do it the right way," but repeatedly stated that he "didn't know" if he would have disciplined Jones or reported him to his lieutenant).

Even more significantly, no evidence in the record circumstantially or directly suggests that McKan had actual knowledge that Philip or Simmons presented an imminent threat of violence to other inmates.  McKan testified that he had no knowledge of the past crimes of these inmates or any disciplinary infractions for serious violent behavior.  (McKan Dep. 81:22-83:1, ECF No. 112-4 at 82-84.)  He further testified that he had never had any problems with Philip or Simmons.  (Id. 125:9-14, ECF No. 112-4 at 126.)  Plaintiffs argue that McKan signed a disciplinary infraction for Simmons on December 27, 2016, where Simmons allegedly hit another inmate with a squeegee. (See Incident Report, ECF No. 112-13 at 6.)  However, this isolated incident cannot reasonably serve as circumstantial evidence that McKan knew that Simmons was likely to commit serious harm in April 2017.  Finally, it is undisputed that McKan did not have knowledge of any impending

or even likely mental decompensation by either inmate.[8]  With respect to McKan, the facts are indistinguishable from those of Rich v. Bruce, discussed above, and compel the same conclusion.

Next, Plaintiffs argue that circumstantial evidence suggests that McKan had knowledge of facts indicating that the murders were occurring and disregarded them.  Constructive knowledge, however, is insufficient to establish liability for directly causing a constitutional injury.  Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) (finding evidence suggesting the defendant should have known is insufficient; case law requires proof that he actually perceived the danger) (citing Rich, 129 F.3d at 340 n.2).  Nor does the record support Plaintiffs' contention that the danger to their decedents was obvious during the murders.  Although McKan passed by Cell 261 several times during the hours of Philip's and Simmons's killing spree, all the evidence suggests that the unit is noisy and that it is not unusual for ICS inmates to wander freely during those hours. (See, e.g., McKan Dep. 171:18-23, 201:21-202:3, ECF No. 111-7 at 172, 202-03; Brown Dep. 247:22-248:6, ECF No. 112-18 at 249-50; Lane Dep. 135:18-136:13, ECF No. 111-8 at 136-37.) Further, unrefuted evidence shows that it was not unusual for inmates to briefly cover their windows while using the toilet despite not being permitted to do so, and the record does not support Plaintiffs' speculation that the window cover was in place for an extended time such that McKan must have seen and disregarded it.  (Compare, e.g., Surveillance Video 7:49:05-08, 8:07:49-53, 8:12:57-59, 8:23:07-12, 8:33:26-8:33:28, 8:34:31-35, 8:43:21-23, 9:03:52-04:21, 9:18:21-27,

---

[8] The defendants further argue that, from a causation standpoint, no evidence suggests that the murders resulted from any mental decompensation or psychotic break by Philip or Simmons. Rather, according to them, the record compels the conclusion that the murders were a cold, calculated, well-planned attack to obtain a death sentence rather than life without parole.  (See SLED Interviews, ECF Nos. 112-7 at 2-4 & 112-8 at 6-9; Simmons Voluntary Statement, ECF No. 112-8 at 2-5; Riley Dep. 153:25-154:2, ECF No. 112-10 at 154-155.)  The court need not address this argument as to causation in light of its conclusions above.  Cf. Scruggs v. Stirling, C/A No. 0:19-921-PJG (addressing Inmate Scruggs's claims of constitutional injury from inadequate mental health care in the ICS).

9:30:36-40 with 9:44:43-47, ECF No. 110-7) (showing that throughout the morning inmates were visible through the window of Cell 261 as they entered and exited the cell, contrasted with no visibility as they exited the cell after killing the fourth victim).

On this record, a jury could not reasonably conclude that McKan's alleged deficiencies rose above negligence to the level of criminal recklessness. See Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) ("[D]eliberate indifference in this context lies somewhere between negligence and purpose or knowledge: namely, recklessness of the subjective type used in criminal law.") (citing Farmer, 511 U.S. at 836). The evidence does not reasonably support a finding that he acted with a sufficiently culpable state of mind such that the tragic deaths of Plaintiffs' decedents could be characterized as punishment by a state actor in violation of the Eighth Amendment and 42 U.S.C. § 1983. See Iko v. Shreve, 535 F.3d 225, 238 (4th Cir. 2008) (stating "absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment' ") (citing Wilson v. Seiter, 501 U.S. 294, 298-300).

**Jones.** Defendant Jones was the correctional officer on duty in the A Wing of the ICS unit on the day of the murders and, along with McKan, discovered the bodies. As with Defendant McKan, Plaintiffs contend that Jones directly caused constitutional injury to their decedents by failing to perceive that the murders were occurring and intervening. For the reasons discussed above, the record does not support Plaintiffs' contention of obviousness. Moreover, the undisputed evidence is that at the time of the murders, Jones was working on the A side of the ICS unit. To the extent Plaintiffs argue that Jones, as a correctional officer in the dorm, should have known the murders were happening, constructive knowledge is insufficient to establish a direct constitutional

violation.[9]  See Parrish, 372 F.3d at 303.  Similarly, for the reasons discussed above with respect to McKan, actual knowledge that Philip and Simmons had ward keeper privileges is alone insufficient to meet the subjective component of actual knowledge of a substantial risk of future serious harm to other inmates.  Cf. Baze v. Rees, 553 U.S. 35, 49-50 (2008) (holding that to establish exposure to a risk of future harm under the Eighth Amendment, the conditions presenting the risk must be "sure or very likely to cause . . . needless suffering," and give rise to "sufficiently imminent dangers") (quoting Helling v. McKinney, 509 U.S. 25, 33, 35 (1993)); Marbury v. Warden, 936 F.3d 1227, 1238 (11th Cir. 2019) ("[S]ubjective awareness of only *some* risk of harm to a prisoner is insufficient for a deliberate-indifference claim.").  Accordingly, Jones is entitled to summary judgment on Plaintiffs' claims based on a failure to protect their decedents.

**Other defendants.**  The remaining defendants are also entitled to summary judgment with respect to Plaintiffs' claims against the defendants for personally causing a constitutional injury to their decedents.  Plaintiffs have not identified evidence from which a reasonable jury could find that any of these defendants possessed both crucial pieces of knowledge to satisfy the subjective component of the Farmer test.  Specifically, they have failed to present direct or circumstantial evidence to show that any defendant actually knew *both* that Philip or Simmons presented an imminent danger of serious harm to other inmates *and* that any action or inaction by that defendant increased that risk to a strong likelihood—rather than a possibility—that they would commit violence against other inmates.  See Welty v. Meletis, No. 3:16CV659, 2019 WL 2656200, at *5 (E.D. Va. June 27, 2019) (requiring a strong likelihood rather than a mere possibility that violence

---

[9] Plaintiffs argue in their memoranda that Jones should have known something was amiss because six inmates were missing at roll call.  However, the unrefuted evidence in the record shows that the roll call scheduled for mid-morning on April 7 did not take place before the murders were discovered.  (See ECF No. 112-6 at 17.)

will occur); see also Patterson v. Smith, No. 1:20CV202 (AJT/MSN), 2021 WL 933860, at *8 (E.D. Va. Mar. 11, 2021) ("Prisons are "inherently dangerous places" where inmate on inmate attacks are inevitable and impossible to eliminate.  While the incident was unfortunate, it does not implicate the Eighth Amendment.") (quoting United States v. Tokash, 282 F.3d 962, 970 (7th Cir. 2002) and citing Shrader v. White, 761 F.2d 975, 980 (4th Cir. 1985); Taylor v. Freeman, 34 F.3d 266, 273 n.6 (4th Cir. 1994)).

Plaintiffs' argument that Warden Riley, Major Jackson, and Associate Wardens Lane and Thompson had access to video showing lax security checks by McKan at most suggests only constructive knowledge, which is insufficient for this type of claim.[10]  Parrish, 372 F.2d at 303. The same applies to their attempt to show knowledge of the risk by Thompson through her duties over the canteen or attendance at mental health treatment team meetings, as well as Lane's service on the ICS board.  See id.  With respect to Plaintiffs' argument that Defendant Whitaker or Defendant Lane failed to remove contraband from Philip and Simmons, the undisputed evidence shows that those two inmates were permitted to have cleaning supplies in their cells because they were head ward keepers.  And no evidence suggests that these defendants knew Philip or Simmons was imminently dangerous.  See Baze, 553 U.S. at 49-50 (requiring that the danger be "sufficiently imminent").  The same applies to Defendants Brown, Garvin, and Pressley.

While Plaintiffs emphasize that Program Manager Kim Jones testified that she warned "security staff" about the risks in the ICS unit, their reliance on this testimony is problematic in at

---

[10] The undisputed evidence shows that while some defendants had access to the video footage in real time, it was not anyone's job in 2017 to continuously watch the monitors.  Rather, all of the evidence shows that these prison administrators could access the video footage if needed, but they had a myriad of other duties such that continuous monitoring was not possible. Accordingly, the circumstantial evidence is insufficient to show that any of these defendants *must have known* (as opposed to should have known) about any security deficiencies by McKan.

least two ways. First, the actual testimony of Kim Jones was not so specific. She stated that that on the occasions that she noticed cleaning supplies in inmates' rooms, she would ask the security officer to put the supplies in the utility closet and lock it, and that she would reiterate to security officers that the cell doors should be locked. (K. Jones Dep. 110:1-111:9, 122:2-22, ECF No. 112-2 at 111-112, 123.) Second, even if this testimony could support an inference of a warning of the specific risk at issue here, the record is insufficient to show that she conveyed this warning to any particular defendant such that a jury could reasonably infer the actual knowledge required for this type of claim.

## C.    Plaintiffs' Medical Claims Against McKan and Jones

Plaintiffs also brought an Eighth Amendment claim against McKan and Jones for deliberate indifference to the medical needs of the decedents when they discovered the bodies. See generally Estelle v. Gamble, 429 U.S. 97, 104-05 (1976) (concluding that deliberate indifference by prison personnel to a prisoner's medical needs is actionable under the Eighth Amendment). Plaintiffs assert that McKan or Jones should have performed CPR rather than waiting for medical personnel to arrive. As acknowledged by Defendant Jones, "failing to provide CPR or other life-saving measures to an inmate in obvious need can provide the basis for liability under § 1983 for deliberate indifference." (Def. Jones Mem. Supp. Summ. J. at 10, ECF No. 108-1 at 10) (quoting Lemire v. Cal. Dept. of Corr. & Rehab., 726 F.3d 1062, 1082 (9th Cir. 2013) (citing McRaven v. Sanders, 577 F.3d 974, 983 (8th Cir. 2009)); Jones v. City of Cincinnati, 521 F.3d 555, 560 (6th Cir. 2008); Bozeman v. Orum, 422 F.3d 1265, 1273 (11th Cir. 2005); Tlamka v. Serrell, 244 F.3d 628, 633 (8th Cir. 2001)). However, as pointed out by Defendant Jones, in those cases there was some evidence that the inmate "had very recently stopped breathing or was otherwise in need of

urgent care, but the defendants ignored those signs of life and chose not to perform life-saving measures." (Id.)

Here, these constitutional claims fail, as no reasonable jury could find that either McKan or Jones actually drew the inference that any decedent's life was still at risk and consciously disregarded it. See Brumfield v. Hollins, 551 F.3d 322, 333 (5th Cir. 2008) (determining that the defendants' failure to undertake any life-saving procedures on an inmate who was found on his cell floor without a pulse and with a shoestring noose around his neck was arguably negligence but not deliberate indifference); (cf. D. Jones Dep. 67:24-68:2, ECF No. 112-3 at 68-69 (testifying that he believed the victims to be dead when he "opened the door and realized that . . . the one on the floor was blue in the face.")). Accordingly, McKan and Jones are entitled to summary judgment on Plaintiffs' claims for deliberate indifference to medical needs.

**D.    Supervisor Claims**

Plaintiffs claim that all the defendants except Jones should also be held liable under a theory of supervisory liability. The law is clear that personal participation of a defendant is a necessary element of a § 1983 claim against a government official in his or her individual capacity. Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009); Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001). Moreover, a claim based upon the doctrine of *respondeat superior* does not give rise to a § 1983 claim. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691-94 (1978). "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676. As the Iqbal Court observed, because masters do not answer for the torts of their servants in § 1983 cases, "the term 'supervisory liability' is a misnomer." Id. at 677.

The focus of Plaintiffs' arguments appears to be that the defendants failed to ensure that McKan was conducting proper security checks. Plaintiffs contend that Defendants Jackson, Pressley, Garvin, and Brown had direct supervisory authority over McKan and/or each other. They also appear to argue that Defendants Thompson, Lane, and Riley failed to properly supervise the defendants under their chain of command. Plaintiffs' expert, James Aiken, testified that his opinion for the liability of the supervisory defendants was based on their positions of authority and being in the chain of command. (Aiken Dep. 162, 165, 167, 175, 178-79, 180-85, 188, 190, 191, 193-94, ECF Nos. 106-20 at 19-21, 24-32, 35, 37-38, 40-41.) This is precisely the type of *respondeat superior* liability that cannot support a § 1983 claim.

While Fourth Circuit precedent recognizes that supervisory officials may be held liable in some circumstances for constitutional injuries directly inflicted by their subordinates, Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994), certain criteria must be demonstrated to trigger such liability. To establish liability as a supervisor under § 1983, a plaintiff must show:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Id. at 799; see also Carter v. Morris, 164 F.3d 215, 221 (4th Cir.1999). Importantly, with regard to the first element, "[e]stablishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." Shaw, 13 F.3d at 799. In stressing the heavy burden of proof to establish deliberate indifference on the part of a supervisor, the Shaw Court relied on the following:

> Ordinarily, [the plaintiff] cannot satisfy his burden of proof by pointing to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his responsibilities. Nor can he reasonably be expected to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct. A supervisor's *continued inaction in the face of documented widespread abuses*, however, provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates.

Id. (quoting Slakan v. Porter, 737 F.2d 368, 372-73 (4th Cir. 1984)) (emphasis added); Danser v. Stansberry, 772 F.3d 340, 347 (4th Cir. 2014) (recognizing deliberate indifference is a very high standard). In light of the potentially limitless number of officials who could ultimately be liable, the "outer limits" of supervisory liability are determined by "pinpointing the persons in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked." Slakan, 737 F.2d at 373.

For all the reasons detailed above, Plaintiffs have failed to establish a constitutional violation by a subordinate. Therefore, they cannot maintain a supervisory liability claim against any of the defendants. See Shaw, 13 F.3d at 798 ("[S]upervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates."); see also Evans v. Chalmers, 703 F.3d 636, 654 (4th Cir. 2012) (stating that a claim under § 1983 for supervisory liability may not succeed without a predicate constitutional violation) (quoting Waybright v. Frederick Cty., 528 F.3d 199, 203 (4th Cir. 2008) ("[S]upervisors and municipalities cannot be liable under § 1983 without some predicate 'constitutional injury at the hands of the individual [state] officer,' at least in suits for damages.")); Hinkle v. City of Clarksburg, W. Va., 81 F.3d 416, 420 (4th Cir. 1996) ("We see no need to address the merits of these claims because all are derivative of Appellants' claim that Officer Lake used excessive force against Wilson,

which was rejected by a jury. In the absence of any underlying use of excessive force against Wilson, liability cannot be placed on either the non-shooting officers, a supervisor, or the City.").

Moreover, for the reasons stated above, even if Plaintiffs could show deliberate indifference by a subordinate, they have not identified any evidence regarding any supervisor defendant of continued inaction in the face of documented, widespread abuses. Shaw, 13 F.3d at 800; Slakan, 737 F.2d at 373. Plaintiffs' evidence fails to reasonably show deliberate indifference or tacit authorization by any supervisor defendant of a subordinate's failure to ensure basic security checks in a mental health unit.

Iqbal and Shaw make clear that a supervisor can be held liable only for his or her own action or inaction, not institutional failure. Other laws may provide a remedy for that, but § 1983 does not. Plaintiffs' supervisory claims cannot survive summary judgment.

## E.    Qualified Immunity

Qualified immunity shields governmental officials performing discretionary functions from liability for damages to the extent that their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To resolve a qualified immunity defense, the court must (1) determine whether the facts alleged, taken in the light most favorable to the plaintiff, show that the defendants' conduct violated a constitutional right, and (2) determine whether the right was clearly established at the time of the alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 231-32 (2009). Courts may address the two prongs of the qualified immunity analysis in whichever order is appropriate in light of the circumstances of the particular case at hand. Id. at 235, 242.

In determining whether the right violated was clearly established, the court defines the right "in light of the specific context of the case, not as a broad general proposition." Parrish ex rel. Lee

v. Cleveland, 372 F.3d 294, 301 (4th Cir. 2004) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).  "If the right was not clearly established in the specific context of the case—that is, if it was not clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted—then the law affords immunity from suit."  Id. (citations and internal quotation marks omitted).  Moreover,

> [a] Government official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.

Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (first alteration added).  In analyzing this prong, a court in this district must first look to case law from the United States Supreme Court, the Court of Appeals for the Fourth Circuit, and the South Carolina Supreme Court, and in the absence of binding authority, the court must next consider whether the right was clearly established based on general constitutional principles or a consensus of persuasive authority.  Booker v. S.C. Dep't of Corrs., 855 F.3d 533, 543 (4th Cir. 2017).  The "salient question" " 'is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.' "  Tolan v. Cotton, 572 U.S. 650, 656 (2014) (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)).

Even if any individual defendant could be found to have violated Plaintiffs' decedents' constitutional rights, he or she would be entitled to qualified immunity because, in the specific context of this case, the defendants would not have fair warning that their action or inaction violated the Eighth Amendment.  Plaintiffs cannot show that in the context of this case, Eighth Amendment law was so clearly established that any defendant knew or should have known that his or her conduct was illegal and that the unlawfulness of the conduct was manifest.  See generally

Pittman v. Nelms, 87 F.3d 116, 119 (4th Cir. 1996); Waterman v. Batton, 393 F.3d 471, 476 (4th Cir. 2005).  If it was not clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted, the law affords immunity from suit.  Parrish, 372 F.3d at 301.  The defendants are entitled to summary judgment on that basis as well.

**ORDER**

For all of the foregoing, it is

**ORDERED** that the defendants' motions for summary judgment are **GRANTED.**  It is further

**ORDERED** that the motions to strike are **DISMISSED AS MOOT**.[11]

**IT IS SO ORDERED.**

December 21, 2021                         Paige J. Gossett
Columbia, South Carolina                 UNITED STATES MAGISTRATE JUDGE

---

[11] By separate motions, some defendants sought to strike the affidavit testimony of Dr. David Husted, Plaintiffs' retained expert in psychiatry.  (See ECF Nos. 113 (Robinson); 116 (Kelley); 115 (King)).  Since that testimony was not relied upon in the court's consideration of the motions for summary judgment in these cases, the motions are moot.  Moreover, consideration of the testimony would not have altered the court's ruling.